and ARCHER DANIELS MIDLAND, et al., 2012-1346. Mr. Thomson. Good morning. The issue in this appeal is how to interpret the scope language of the anti-dumping and countervailing duty orders on citric acid and surface citrate salts from China. As a starting point, don't we have to give an awful lot of deference to how the government interprets it? Well, Your Honor, we don't believe that deference is due to a misinterpretation of the plain language of the orders scope. We don't have cases that say we give substantial deference to Commerce's interpretation of its own orders? Oh, you would give deference to its interpretation. However, when it's plainly wrong, as this Court has found in a number of cases, no deference is going to be due. And we think that on the plain language of the orders in this case, there's only one interpretation that's possible. Deference would be permissible if there were a question about what the order meant. We believe that the order has one explicit meaning only, and that is that blends that have non-subject citric acid in them of the requisite percentage are excluded on the face of the order. Why is that so clear? Well, because the citric acid is citric acid. Citric acid from China, however, is the product that's subject to the orders. And the first sentence of the orders defines the merchandise that's covered. And, of course, that merchandise is citric acid from China. That's not a description of all citric acid from anywhere in the world.  But it also includes blends of citric acid as well as blends with other ingredients, such as sugar, where the unblended form constitutes 40% or more, which certainly applies here because between the citric acid from China and the other citric acid, it's more than 40%. But our position is that based on the structure of the scope language, citric acid from somewhere other than China constitutes an other ingredient. It's not like sugar. Well, the reference to such as sugar is exemplary, but it is not limiting. There is no limitation. I don't remember the Latin expression, but you know a word by its friends. Well, if you want to use Euston Generous from... No, it's another Latin expression, but you know it. Yes. Nascitore Socius, I believe. But this would not apply because there's no limitation put on the other ingredients. Such as sugar gives you one example of a product that constitutes an other ingredient, but it by no means eliminates anything else. What does eliminate, what does open, rather, the definition is that it says other, when it says blends with other ingredients, you have to refer back to the predecessor provisions of the orders to determine what those other ingredients are. And those other ingredients have to be anything that's not covered in the first sentence. So that is our position, that other ingredients excludes Chinese citric acid and other citrate salts, but it includes anything else, including non-subject citrates. So when the first sentence refers to unblended forms, you're saying that means unblended with something from the country of origin? That means, yes, if it's citric acid, pure citric acid from China, that's what's covered. And then by the same token, sodium citrate and potassium citrate, those coming in as separate items, they're covered. Then the second sentence... Coming in as separate items from China. As separate items, unblended with each other. And then the second one is the scope also includes blends of citric acid, sodium citrate, and potassium citrate. So if you took those Chinese products and blended any of them together, what this language says is that's going to be covered as well. Now, we're talking about that first sentence and the first part of the second sentence. That's purely Chinese product. All right? It's not talking about blends of Chinese product. But when you say that it's plain language interpretation, where in that first sentence does it say only purely Chinese product? Because it's an anti-dumping duty order on citric acid from China. So that it doesn't include the statement from China. That is implicit throughout. You couldn't... There's no way that you can interpret that first sentence as covering citric acid from anywhere else. Because the order only applies to China. What Congress has done is overlooked that orders have not only physical descriptions, but also are limited geographically to a particular country. So their reading is inconsistent with the limitations, these dual limitations that are put on anti-dumping countervailing duty orders. So we believe that straightforward reading of the orders leads to the result that citric acid from some third country constitutes an other ingredient. And that when you have a blend of 65% non-subject citric acid, that is excluded under the second clause of the second sentence. It's hard for me to reach that conclusion when it says all grades and granule sizes of citric acid in the first sentence. And then the second sentence says blends with other ingredients. It's hard for me to reach the conclusion that an other ingredient is citric acid. Well, it's citric acid from another country. Because other ingredients refers back to the first sentence. And the first sentence doesn't say Chinese citric acid. But it's part of the anti-dumping order that covers only China. Right, which is why they're only going after whatever it is, 35% of what you're bringing in. They're not trying to assess the duty on 100% of what you're bringing in. Is that right? But our position is that the entire blend is excluded under the second clause of the second sentence. There's other ingredients. I think you are too narrowly construing what that means. It's other than what precedes it. And what precedes it can only be considered Chinese citric acid. It doesn't say that in that prior sentence. It says all grades and granule sizes of citric acid. If you look at the scope, it covers citric acid from China. So how could a description of a product include something other than citric acid from China? See, that has to permeate the entire understanding of the scope language. We're not talking about citric acid in the abstract. And you would absolutely be right if they were trying to assess duty against 100% of your product, it seems to me. Because if they were assessing duty against 100% of your product, they would be treating it as though it was all citric acid from China. But the error that they're making is treating us not as a blend under the second clause of the second sentence. You do realize, but you're not a blend in sort of the traditional sense of the word. There's citric acid, and then there's more citric acid. That's not blended with anything. It's all citric acid. Oh, but it's Chinese citric acid blended with non-Chinese. Is there some technological difference between the two? No. No difference other than country of origin. There's no difference chemically. It's just country of origin. No. So, leaving aside, I'm not sure what the country of origin would be, or perhaps under customs principles, the Chinese and non-Chinese portions would be allocated to different countries. But in this case, a blend, the plain definition of blend means mixing something with something else. And the something that's being blended is the Chinese citric acid with something else. Of course, by your definition, if you take 10% Chinese citric acid and add 25% Chinese citric acid, that's a blend. No. Because you're blending them. Not in the terms of the order. Because when it talks about, when it says citric acid in its unblended forms, the blend that is being referred to is going to be the blend of Chinese citric acid. See, the order doesn't cover individual companies, per se. It covers citric acid from China. So the blend is something being blended in with citric acid from China, no matter what lot it came from or no matter what company it came from. So we believe that there's no other interpretation of other ingredients, that commerce's statement that we're commingled rather than blended is simply wrong as a matter of vocabulary. Commingling is a synonym of blend. And so what commerce is statically admitting there is that we are a blend. But I see no basis for saying that you have to be something other than citric acid in general to constitute a blend. The way it's set up is a blend can be something other than Chinese citric acid. Where in the appendix is the order itself that we're talking about? Well, you entered the rebuttal time. It's a sort of a single issue, which we understand. Yes. You want to save the rest of the time? Yes, sir. Okay. Ms. McAuliffe. And you're going to take 10 minutes, and then you'll blend your argument with Mr. Schneider. I'll blend it, yes, Your Honor. Or maybe commingle it. May it please the Court. As this Court knows, the Court of International Trade frequently upholds commerce's determinations as reasonable, but this is one of the rare cases in which they use the adverb eminently reasonable because there's really no question, there's no dispute that the subject product here is pure citric acid. What page is the order on? Your Honor, I apologize. The order is the scope language is cited at 74, Fed rank at 27703. It was not included in the appendix. How could you guys have a whole case about what the order says and not give me the order? I don't disagree and apologize on behalf of the Department for not including that. But there are Federal Register notices there that should have been included. There's no question about it. But there's no dispute that this is pure citric acid that falls squarely within the first sentence of the scope language in the Federal Register notice. I apologize again. And the global commodities group repeatedly refers to the blended language as an exclusion. And as Judge Carvin noted before, commerce's explanation for this was compelling because it's not an exclusion. It was intended to expand the scope of the order to include not just pure citric acid and pure citrates, but to allow them to be blended with each other and to be blended with other ingredients. So the whole purpose of this, because the domestic industry demonstrated that the dumping of these products was causing injury to the domestic industry, the purpose of it was to have the scope of the order cover so there could be a proper remedy for this. But aren't all scope orders limited geographically? Isn't that an inherent aspect of the scope order? The scope order, I'm sorry, limited to what, Your Honor? Isn't it a geographic limitation that we're talking about? Yes, of course, Your Honor. But on page 39 of the Joint Appendix in the preliminary scope rule, commerce identified two instances, at least two instances, in which subject merchandise has been commingled with non-subject merchandise from other countries. And it proposed a methodology. They cited two cases, one from 1952, which is U.S. industrial chemical, and a second one from 1986, which is coastal states marketing, and proposed a methodology to ensure that there's not an overassessment of duties, that only the citric acid that's from China is assessed duties. And there's a methodology that commerce proposed that wasn't any objection. Why is 40% citric acid from China okay as long as it's mixed with sugar, but it's not okay if it's mixed with citric acid from non-subject countries? I think it depends on the nature of the product. The fact of the matter is that a commercial product such as citric acid was being dumped on the market in the United States. Theoretically, if you have a 98% sugar. But there was no evidence of any of this right below. This was all just based on the face of the order. You're saying that just from a pure language standpoint, that's the end of the inquiry. All this analysis about what the order was intended to get to, none of that is in the record, is it? Well, there's the record, of course, of the investigation and the record of what led commerce to do this. But even under the plain language, other – first, let me back up a little bit. There has never been, in global commodities, we can't cite any case in which there's been a conflation between the country of origin and the physical description of the product. The physical description of the product relates to the physical characteristics of the product. Whether it be sugar, whether it be pure citric acid, whether it be citric salt, it's the physical description describes the product. The country of origin is a limitation, but it's exogenous to the physical description. And the idea that – and even global commodities, and page 10 of its blue brief refers to an inherent geographical restriction or geographic restriction, which is an odd pure plain language argument to be making, to be drawing inferences into your plain language argument, because there isn't any express geographic limitation. So this was a product that was defined originally as pure, and commerce asked for clarification, and the domestic industry added this other language to include blends to make sure that the injury would be fully remedied. Again, there's no overreaching because there's only an assessment and duties of that portion of the commingled citric acid that's from China. And another point, for instance, just to get a context of what's really going on here, is this product did not exist before the order. The order is being – this product is being sort of coincidentally held to being less than 40 percent Chinese. You mean it's tailored to avoid the order? This product is being tailored to the order. On page 17 – I'm sorry, page 13. But going to the language of the order itself, you agree when it says the scope of these orders includes all grades, granulations, sizes of citric acid, that it really isn't all sizes of citric acid. It's all sizes of citric acid from China. The scope of this order doesn't include citric acid from another country, correct? Correct. But let's say hypothetically that commerce had never asked for a clarification of the domestic industry, and this blended language was never added. I imagine that it would be undisputed that even a portion of citric acid, pure citric acid that is commingled with citric acid from other countries, would still be subject to the order, subject to this methodology, which was used in 1952 and used in 1986, where there's just a proper assessment. Does it fall squarely within the blended language? Well, I don't think he would agree because he would say, as he does now, that his is a blend and the first sentence says the scope of these orders includes all grades and granulations of citric acid in their unblended forms. But citric acid is- I'm sorry. But that sentence was there before they added the blended sentence, so I think he would say that this scope, that his product, once it's blended, isn't pure citric acid, and the first sentence only covers pure citric acid from China. But blended refers to the physical characteristics, and commingling citric acid with other citric acid does not change the physical characteristics. There's been no substantial transformation of this product. Well, but wait. There's nothing here that says this is limited to the physical characteristics. In fact, the sentence begins, the scope of these orders. Well, you acknowledge that the scope of these orders is not just to citric acid. It's to Chinese citric acid, that the physical citric acid that is identical to Chinese citric acid but originates from another country would not be covered. I respectfully disagree with you, Your Honor. It would be covered? The citric acid that comes from Haiti is covered? No, but if there's a portion of the citric acid that comes from China, it is covered, and then the proper approach would be to have a methodology that captures just that portion. But you want me to read this scope sentence as limited to citric acid from China? Is that right? Yes. Even though it has 65% citric acid from, say, Korea? Yes. Because it's coming from China. Because it's coming from China, so long as the portion of the citric acid from China is properly assessed. And that's the methodology, and that's what happened. Again, the Department of Commerce has faced incidences of the past, as explained in its preliminary scope ruling. Again, there was no objection to this methodology of using assessments, assessing duties just to deal with the portion of the commingled merchandise that's under the order. But the point I want to make is that there was never a market for this product beforehand, and this is essentially a giant gotcha. At page 17 of the- Well, making a product that is designed to comply with a governmental order isn't a bad thing in and of itself. We want them to try to comply with governmental orders, right? But this was never the intent. This is creating a new product that consists of citric acid, pure citric acid, including citric acid from China. You would say this is designed to avoid the governmental order? Well, I want to be careful, because there hasn't been a circumvention inquiry, and I don't want to overstate it. But clearly, at page 17 of the reply brief, Global Commodities Group uses the term loophole. That's their word, not our word. They're looking for this as a loophole. Utterly contrary to the intent of commerce. Why? Commerce has already said that if you bring in a blend that has less than 40% citric acid from China, then it's okay. And so they're bringing in less than 40% citric acid from China, so why isn't that okay? Your Honor, because that would be referring to a different product, not pure citric acid. The blend would be, for instance, if you have 98% sugar and you add a little bit of citric acid- No, you can add- No, not a little bit. You can add up to 40%. But that's a different product. It's under a different harmonized tariff classification. There hasn't been any demonstration that that type of product would cause injury to the domestic industry. There has been a demonstration here that citric acid, pure citric acid from China, has caused substantial injury to the domestic industry, and this product has not been substantially transformed. There's no objection to commerce's substantial transformation analysis. I don't know if there are any other further questions. I respectfully request that order be- Thank you, Ms. McCarthy. Mr. Schneiderman is representing ADM. Is it ADM? Yes, thank you, Your Honor. May it please the Court. I think what we have here is that Mr. Thompson just fundamentally misunderstands how the physical description of the class or kind must be read in conjunction with a country of origin requirement. As we've said in our brief, first you look exclusively at the physical description of the class or kind without any regard to the country of origin, so you don't insert the words from China in that first sentence. And at the completion of that analysis, then you ask, well, is the country of origin for this product from China? So your argument really is that a blend has to include something other than pure citric acid, regardless of where it's from. Something other than pure citric acid. And more importantly, you look at- Once you first determine, is it a blend? If it is, then you ask, is the country of origin China? And that question is not answered by saying, well, does it include citric acid from China? The example that Mr. Thompson gave is, what if you have French citric acid, which you then mix with Mexican sugar in China? He's saying if you read the scope of the way Congress would like, that would nullify the country of origin requirement, bring this within the scope. The problem with that is that when you look at a true blend, such as citric acid and sugar, the question is, where does substantial transformation occur? If substantial transformation occurs in China, say they're bringing in French citric acid, transforming it in China, that is a blend that is covered by the scope of the order because the country of origin becomes China. Essentially, the French nature of the citric acid becomes an article of China. That is covered by the scope. That question's not really before us. It's not before you, but it shows that you don't— in other words, it shows that you have to look at the physical description independently from country of origin. Why aren't the other ingredients anything that isn't the ingredients about which the duty is being assessed? So why isn't citric acid from another country an other ingredient? Because, as I said, first you look at the physical description. The first sentence covers pure citric acid. That's what we have here, pure citric acid. Now his argument is that if you don't— if you interpret other ingredients to— if you don't interpret the word other ingredients to include citric acid from third countries, you nullify the country of origin requirement. Well, you don't. If you have a blend, the question is, is that blend from China? It doesn't nullify the country of origin requirement. If the blending in China is substantial transformation, then it doesn't matter whether the citric acid was produced in China. So the scope is not necessarily restricted to blends. In other words, there's no basis to say that the scope only includes blends where the citric acid production and the blending was performed in China, regardless of where the scope is. Okay, wait, I'm confused. Maybe you misspoke or maybe I misunderstood you. Are you saying that if they took citric acid not from China, not Chinese citric acid, and blended it with other stuff, somehow it could fall within this duty order? It depends. If a substantial transformation occurs, confirm Chinese origin. I was pretty sure that this duty, as I understood the government arguing it, applies to citric acid from China. That's correct. Or blends of citric acid. Right, where the citric acid component has to come from China. Not necessarily, Your Honor, respectfully. It does include pure citric acid originated from China, but if it's a blend, you then have to, and again, you look at blend without regard to country of origin of where the components are originating from. You have to decide, is that blend from China? And to do that, you have to look at where the substantial transformation occurs. If they're importing – I'm not taking a position on whether mixing citric acid with sugar is a substantial transformation. If it's not, then obviously China's not the country of origin. It wouldn't be covered by the scope. But if it is, then it doesn't matter whether it's – The first sentence of the summary of Commerce's Federal Register says, Commerce Department is issuing anti-duty orders on citric acid and certain citric acid salts from Canada and China. So I don't see how a blend, if the citric acid itself doesn't come from China, is included in this duty order. Well, again, that's not the issue presented here. The reason I bring it up is because Mr. Thompson presented it as an example to say that that would be the logical conclusion if you adopted Commerce's interpretation. I don't think there's any problem with that logical conclusion. I think that blends, if they originate from China, the blend is within the physical scope, and it originates from China, I don't see a problem with that falling within the scope of the order. There's nothing that says that the – in the case of a blend, that the citric component has to originate from China. But again, we're not even in that hypothetical situation. This is a pure citric product, and there's no – it's uncontested that the country of origin for that citric product is China. Any final thought? I would concur with Ms. McCarthy's description of this as an attempt to evade or circumvent the order. Frankly, I think the whole argument that they've come up with is a post-hoc explanation. I think that they were in their original customs. But that's sort of coloration. Yes, Your Honor. Nothing further. Thank you very much, Mr. Scheinman. Thank you, Your Honor. Mr. Thompson has four and a half minutes to rebut if he needs it. I'll speak past Your Honor. All right. Better not to speak so fast. Okay. First, I'd like to address the supposed two-step process under which the first question is, is this citric acid from anywhere? And then, is it from China? The dumping order is unitary. It only covers citric acid from China. So this attempt to say, well, somehow the first sentence could be construed to cover all citric acid from anywhere, and then only then can we start to – Because you're only assessed on the amount from China. Well, see, that would be – if we didn't have that second clause, that would be a proper outcome. But it's the second clause, and we heard the government say, well, that includes certain products. But by necessary implication, it also excludes products that have below the threshold of 40 percent Chinese citric acid. See, your concept is whatever you mix it with, as long as you keep it under 40 percent, you're fine. Exactly, exactly. And Judge Moore, you put the case much better than I have in the past couple of years. But that is precisely what we are arguing, that anything other than Chinese citric acid, which is the product that is defined in the first sentence, is an other ingredient. So then – Then why didn't they just say in the first sentence that it applies to unblended citric acid as long as it's, you know, not less than 40 percent? I'm not sure why they posed the exclusion and the inclusion this way. It was – I could speculate, but – Do you agree with the government that they're really different products and cause different damage to the domestic industry? I don't agree at all. The exclusion was crafted by the petitioners to identify products that, for whatever reason, they didn't see as injurious, or at least subject to the case. So the question is, what is the interpretation of the language that the petitioners crafted? Again, you know, there was brief discussion of sort of the history of this provision. If you go to page 11 of our brief, page 16 of the governance brief, this is our reply brief, we have a quote from the correspondence that petitioners had with Commerce. And they said that their concern was that they defined subject merchandise as citric products. And then they said – so this goes to the exclusion and says, as well as ones with other ingredients in which one or more of the citric products represent the predominant ingredient. Well, the citric products there that they refer to is the subject merchandise, citric from China. They have defined in court and Commerce both got this wrong, but they weren't looking to expand it to all citric products. They defined it in their correspondence. The citric that they were referring to was the subject merchandise from China. So this idea that they were trying to come up with a very expansive provision is simply belied not only by the scope language in our view, but also to the extent that it's proper to consult the sort of history to how this provision was adopted. It's belied by their own characterization to the agency. The government identified a couple of cases in which chemical products had the dumped and non-dumped parts separated out. That's very interesting, but it's beside the point here. Those orders did not have the blend exclusion language that we have here. And that's what makes all the difference. I would agree. If that blend language didn't apply, then we would have a very different case. But unlike every other dumping order that I am aware of, there is an exclusion for certain blended products. So what's being presented to the court is whether or not citric from China blended with citric from another country constitutes an excluded blend. So if there are no further questions, Your Honor, I'll... Thank you, Mr. Thompson. Case under revision.